No. 21-2205

---

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

**JODY LUTTER,**
**Appellant**

v.

**JNESO, et al.,**
**Appellees**

---

ON APPEAL FROM THE ORDER DATED JULY 19, 2021,
ENTERED BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY,
CIVIL ACTION NO: 1:19-CV-13478, HON. RENEE MARIE BUMB, U.S.D.J.

---

REPLY BRIEF OF APPELLANT JODY LUTTER

---

Patrick J. Wright
**Mackinac Center Legal Foundation**
140 West Main Street
Midland, Michigan 48642
(989) 631-0900
wright@mackinac.org

Matthew C. Moench
**King Moench Hirniak & Collins, LLP**
51 Gibraltar Drive, Suite 2F
Morris Plains, New Jersey 07950
(973) 998-6860
mcm@kmhmlawfirm.com

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................i

**TABLE OF AUTHORITIES** ...................................................................... iii

**ARGUMENT** ..............................................................................................1

**I.    RESPONDENTS' ACTIONS ARE MOTIVATED BY AN EFFORT TO AVOID JUDICIAL REVIEW OF THE CONSTITUTIONALITY OF THE WDEA, WHICH SHOULD NOT BE PERMITTED BY THE COURT** ...............................................................................................1

    A. The Broader Policy Background Provides Context as to the Parties' Motivations in this Case ...................................**1**

    B. New Jersey Legislature Passes the WDEA to Mitigate The Impact of *Janus* and to Make It Harder for Members to Leave the Union and Cease Financial Support. ...................................**4**

    C. The Impact of *Janus* and the Factual Circumstances Presented By Jody Lutter Make this the Exact Case the Union Defendants Do Not Want Adjudicated on the Merits ....................................................**7**

    D. Defendants Take Steps to Avoid Judicial Review ...................**10**

**II.    DEFENDANTS' DELAY TACTICS SHOULD BE REJECTED AND THE COURT SHOULD DECLARE THE WDEA UNCONSTITUTIONAL** ........................................................................**11**

    A. Even if the Court were to find *Fischer* is persuasive, the Dues Authorization in Lutter is factually and legally distinguishable .....**11**

    B. Defendants Seek to Avoid an Adjudication on the Merits as They Recognize This Case Presents A Fact Pattern Which Supports A Finding that the WDEA is Unconstitutional ........................................**13**

    C. Certification To the New Jersey Supreme Court is Not Appropriate ......**17**

D. This Matter Is Justiciable, and Defendants' Attempts to avoid Judicial Review Should Not be Permitted .......................................................**18**

E. The Eleventh Amendment Does Not Bar Plaintiff's Claims .............**20**

**RELIEF REQUESTED** ..........................................................................**21**

# TABLE OF AUTHORITIES

## CASES

*Anderson v. SEIU Local 503*,
No. 21-609,____ S. Ct. ____ (Jan. 10, 2022).................................................8

*Berardi v. Swanson Mem'l Lodge No. 48 of Fraternal Order of Police*,
920 F.2d 198 (3d Cir. 1990) ...........................................................17

*Bais Yaakov of Spring Valley v. ACT, Inc.*,
12 F.4th 81 (1st Cir. 2021) ...........................................................19

*Campbell-Ewald Co. v. Gomez,*
577 U.S. 153 (2016).................................................................10, 19

*Cohen v. Cowles Media Co.*,
501 U.S. 663 (1991)......................................................................7

*Conrad v. Boiron, Inc.,*
869 F.3d 536 (7th Cir. 2017) ......................................................11

*Ex parte Young*,
209 U.S. 123 (1908) ...................................................................21

*Fischer v. Governor of New Jersey*,
842 Fed. Appx. 741 (3d Cir. 2021) ......................................*passim*

*Friedrichs v. Cal. Teachers Ass'n*,
578 U.S. 1 (2016)......................................................................1, 5

*Harris v. Quinn*,
573 U.S. 616 (2014)...................................................................1, 5

*Hartnett v. Pa. State Educ. Ass'n.,*
963 F.3d 301 (3d Cir. 2020) ......................................................16

*Knox v. Serv. Emp.,*
567 U.S. 298 (2012) ...................................................................1

*Janus v. AFSCME Council 31,*
　　138 S. Ct. 2448 (2018)............................................................... *passim*

*LaSpina v. SEIU Pa. State Council,*
　　985 F.3d 278 (3d Cir. 2021) ............................................... *passim*

*Smith v. New Jersey Education Association*,
　　425 F. Supp. 3d 366 (D.N.J. 2019) ...............................................14

*Thulen v. AFSCME New Jersey Council 63,*
　　844 Fed. Appx. 515 (3d Cir. 2021)....................................... 14, 15

*Whole Woman's Health v. Jackson*,
　　595 U.S. ___, 142 S. Ct. 522 (2021) ................................... 20, 21

### STATUTES

Cal. Educ. Code § 45060 ............................................................6

Hawaii Rev. Stat. § 89-4(c) .........................................................6

Mich. Comp. Laws § 423.210(3) .................................................3

<u>N.J.S.A.</u> § 34:13A-5.12.................................................................4

<u>N.J.S.A.</u> § 34:13A-5.13.................................................................5

<u>N.J.S.A.</u> 34:13A-5.13(d) .............................................................5

<u>N.J.S.A.</u> § 34:13A-5.14.................................................................5

<u>N.J.S.A.</u> § 52:14-15.9e .......................................................... *passim*

N.Y. Gen. Mun. Law § 93-b .......................................................6

Wis. Stat. § 111.70(2) .................................................................3

Wis. Stat. § 111.845 ....................................................................3

29 U.S.C. § 186..........................................................................9

**RULES**

Fed. R. Civ. P. 12(b)(1)...........................................................................................17

**TREATISES**

Robert A. Gorman and Matthew W. Finkin, Basic Text on Labor Law
Unionization and Collective Bargaining (2nd Ed Thomson West 2004) ............2, 3

**Other Sources**

Justice Department's Opinion on Checkoff, 22 LRRM 46–47 (1948) ....................9

# ARGUMENT

## I. RESPONDENTS' ACTIONS ARE MOTIVATED BY AN EFFORT TO AVOID JUDICIAL REVIEW OF THE CONSTITUTIONALITY OF THE WDEA, WHICH SHOULD NOT BE PERMITTED BY THE COURT

### A. The Broader Policy Background Provides Context as to the Parties' Motivations in this Case

As of 2012, the Supreme Court telegraphed that it was willing to consider changing the law concerning compelled financial support to public-sector unions. See generally *Knox v. Serv. Emp.*, 567 U.S. 298 (2012) and *Harris v. Quinn*, 573 U.S. 616 (2014). Those following the issue expected the question to be decided in *Friedrichs v. California Teachers Association*, 578 U.S. 1 (2016), but Justice Scalia's passing left the Supreme Court in a 4-4 tie on the matter. *Janus v. AFSCME Council 31*, 138 S. Ct. 2448 (2018) was recognized as the case where a change in the law might occur.

The questions leading into *Janus* focused on what the change could be and perhaps how it would apply to the 4.8 million public-sector employees who were covered by a collective-bargaining agreement in agency-fee states in 2018.[1] Some 4.6 million of these employees were union members and the remainder were fee payers. Using a five-year rolling average from 2014 to 2018 (for sufficient statistical

---

[1] The union-coverage and employee-membership numbers in this paragraph were generated by doing a statistical examination of data from the 2018 Bureau of Labor Statistics annual union membership survey.

weighting purposes), New Jersey had 326,000 public employees covered by public-sector union contract and 315,000 of those were union members. Pennsylvania had 286,000 covered and 267,000 members. Finally, Delaware had 21,500 covered employees and 20,300 union members. Prior to *Janus*, AFSCME had surveyed 600,000 of its 1.6 million members and found that many might forgo paying dues if given the opportunity. The survey showed 35% would pay dues "no matter what," 50% were "on the fence," and the remaining 15% were likely not to pay dues.[2]

Thus, a major question leading into *Janus* was if the Court were to constitutionalize a right-to-work framework on states with mandatory bargaining laws for public sector workers (i.e. mandatory bargaining could continue, but any state law allowing the charging of agency fees to nonunion members would be unconstitutional) how would current union members be affected? When could they resign? When would they be able to end financial support to a mandatory public-sector union? What if they had a dues checkoff?

A leading labor treatise describes a "dues checkoff" in this manner:

> A dues checkoff provision in itself requires no one to join a union or retain membership in a union, but simply provides that the employer shall deduct from the earnings of those union members who authorize it the periodic membership dues (just as it would for taxes, insurance premiums or charitable contributions) and shall pay that amount directly to the union. The checkoff is commonly utilized in conjunction

---

[2] https://www.bloomberg.com/news/articles/2017-02-16/unionsare-losing-their-decades-long-right-to-work-fight

> with some more effective union security provision. It relieves the union
> of the burden in time and expense of collecting membership dues.

Robert A. Gorman and Matthew W. Finkin, Basic Text on Labor Law Unionization and Collective Bargaining (2nd Ed Thomson West 2004) at 901. A dues authorization **may** contain sufficient terms and consideration to constitute a contract and it **may** contain more terms than just allowing the employer to deduct dues.

In the years leading up to *Janus*, public-sector unions and groups opposed to forcing public employees to support those unions had some experience with a change from an agency-fee environment to a right-to-work environment. In June 2011, Wisconsin passed Act 10, which included a public-sector-right-to-work component. See Wis. Stat. § 111.70(2); Wis. Stat. § 111.845. Michigan enacted a public-sector right-to-work law in December 2012. See Mich. Comp. Laws § 423.210(3). In Michigan, one of the undersigned's employer, the Mackinac Center for Public Policy, began an informational campaign in June 2014 called "August Opt Out" to inform Michigan's teachers of their ability to leave the union. According to its LM-2 forms[3] filed with the United States Department of Labor, in 2014, the Michigan

---

[3] These forms can be found at https://www.dol.gov/agencies/olms/public-disclosure-room. After hitting the "Union Search" link, enter 512840 into the report-numbers box. Links for the current and past LM-2s for the Michigan Education Association will be shown. Dues money is the first line of Statement B. Membership is Schedule 13. EA means full-time teachers and ESP means educations support staff. These two categories are added together to get the relevant membership.

Education Association's membership was at 107,868 and it collected $56,691,409 in dues. In 2021, those numbers had dropped to 80,904 members and $46,880,637 in dues. After *Harris*, other organizations sought to inform public-sector home-help and home-day-care union members of their ability to leave their unions.

In deciding *Janus*, the Supreme Court indicated there was a large amount of money that was involved in the aggregate:

> We recognize that the loss of payments from nonmembers may cause unions to experience unpleasant transition costs in the short term, and may require unions to make adjustments in order to attract and retain members. But we must weigh these disadvantages against the considerable windfall that unions have received under *Abood* for the past 41 years. It is hard to estimate **how many billions of dollars** have been taken from nonmembers and transferred to public-sector unions in violation of the First Amendment. Those unconstitutional exactions cannot be allowed to continue indefinitely.

*Janus*, 138 S. Ct. at 2485-86 (emphasis added).

### B. New Jersey Legislature Passes the WDEA to Mitigate the Impact of *Janus* and to Make It Harder for Members to Leave the Union and Cease Financial Support

The size of the stakes was not lost on the public-sector unions and their political allies in the days leading up to *Janus*. On May 18, 2018, the New Jersey Legislature approved the WDEA. The Legislature found "collective negotiations promote labor stability in the public sector and enhance the delivery and avoid the disruption of public services." L. 2018 c. 15 § 2 codified at <u>N.J.S.A.</u> § 34:13A-5.12. To help unions retain membership levels, the unions were given the right to meet

employees on work premises during the work day, the right of access to new hires, and access to various contact information on public employees in the bargaining unit. L. 2018 c. 15 § 3 codified at <u>N.J.S.A.</u> § 34:13A-5.13. This contact information is due both within 10 days of hire for an individual and then on a 120-day rolling basis for the aggregate list of employees in the unit. *Id*.

Likely being aware that in Michigan, California, Oregon, and Washington third parties had engaged in campaigns informing public employees about right to work (Michigan) and the impact of *Harris v. Quinn* (California, Oregon, and Washington), the New Jersey Legislature made the employee list exclusive to the unions and exempt from public disclosure. <u>N.J.S.A.</u> 34:13A-5.13(d). This exclusion would make it harder for third parties to notify public employees about their rights under *Janus* since they would not be able to determine where to contact the affected public employees in New Jersey.

To further mitigate or prevent membership loss to the unions, the New Jersey Legislature prohibited public employers from "encourage[ing] negotiations unit members to <u>resign or relinquish membership</u> in an exclusive representative employee organization and shall not encourage negotiation unit members to <u>revoke authorization of the deduction of fees</u> to an exclusive representative employee organization." L. 2018 c. 15 § 4 codified at <u>N.J.S.A.</u> § 34:13A-5.14 (emphasis

added). To enforce this, public employers can be held liable "for any losses suffered by the organization as a result of the public employer's unlawful conduct." *Id*.

It is also possible that in passing the WDEA, the New Jersey Legislature was aware of the results of the previously discussed "August Opt Out" campaign, which got its name since all the covered employees had the option of resigning membership and withdrawing their dues authorizations in that month. By having all the employees have the same option the campaign required no knowledge of employees' individual circumstances and its promotional materials could be concentrated around the single time of decision. Use of anniversary dates, however, would require knowledge of an individual's particular circumstance if the goal was to provide that employee with information near his or her decision date.

When the New Jersey Legislature chose to amend N.J.S.A. § 52:14-15.9e, which had laid dormant since 1981, it chose to change from allowing public employees to withdraw their dues authorizations at "any time" and instead limited public employees to the 10 days following their "anniversary date of employment." N.J.S.A. § 52:14-15.9e.[4]  Any notion that the WDEA was amended to protect the rights of public employees is belied by the context within which the change occurred,

---

[4] New Jersey was just one union friendly jurisdiction to attempt to dilute the effect of *Janus*. Putting the other types of *Janus* responses to the side, some statutes limiting dues-authorization-withdrawal periods include the following. Cal. Educ. Code § 45060; N.Y. Gen. Mun. Law § 93-b; and Hawaii Rev. Stat. § 89-4(c).

as well as the other amendments contained in the legislation, which clearly

demonstrate an intent to protect the public sector union's membership.  Similarly,

any argument by Defendants that the language of the WDEA should be read as

"expanding" the ability of union members to leave the union is specious.

### C. The Impact of *Janus* and the Factual Circumstances Presented By Jody Lutter Make this the Exact Case the Union Defendants Do Not Want Adjudicated on the Merits

When *Janus* was decided, many opposed to compelled support of public-

sector unions hoped that the following language meant that the portion of the 4.6

million unionized public employees in agency-fee jurisdictions who wanted to

continue financial support of the unions would have to sign new authorizations that

met the constitutional-waiver analysis before any further deductions could occur:

> This procedure violates the First Amendment and cannot continue. Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay. By agreeing to pay, nonmembers are waiving their First Amendment rights, and such a waiver cannot be presumed. Rather, to be effective, the waiver must be freely given and shown by "clear and compelling" evidence. Unless employees clearly and affirmatively consent before any money is taken from them, this standard cannot be met.

*Janus*, 138 S. Ct. at 2486 (citations omitted). A number of lawsuits were filed using

this theory (including, in part, this one). Consistently, the various federal courts have

cited *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), and indicated that the terms

of a pre-*Janus* dues authorization containing limitations on when an employee can

end financial support need to be enforced. The latest Supreme Court denial of certiorari wherein that question was presented was on January 10, 2022. *Anderson v. SEIU Local 503*, No. 21-609 (Question 1). Plaintiff Appellant preserves the issue here, but is aware that this argument has performed poorly throughout the federal courts.

But, what makes this case unique, is Lutter did not base all of her merits argument on *Janus*. Instead, she alternatively argued that non-*Janus* caselaw supports a constitutional right to resign, Appellant's Brief at 32-44, and that there is also a constitutional right to end financial support to a public-sector union. *Id*. at 44-49.

Unlike some of the other cases addressing this issue, this case cannot be decided on *Cohen* grounds because the dues authorization contains no terms indicating there is any limitation on Lutter's timing of withdrawal. Therefore, it is solely the state statute that is the justification for making her continue financial support after indicating a desire to resign and end such support.

The recognition of the right to resign and end financial support would be key for a couple of reasons. First, it would mean that union members seeking to leave would have federal constitutional claims that could be brought in federal courts instead of a state contract claim that would need to be brought in state courts and/or some sort of state-labor-law claim that would need to be brought before a state labor

board wherein the public-sector unions might have significant influence. Second, it would mean that there is a constitutionally recognized outer limit to how long an employee can be held in a union or forced to support one. Right now, outside of the maintenance-of-membership context,[5] most dues authorizations have an annual window (again, Lutter's does not). The United States Department of Justice opined more than 70 years ago that union dues deduction authorizations with an annual window for revocation comport with 29 U.S.C. § 186, which regulates dues authorizations for employees covered by the National Labor Relations Act. *Justice Department's Opinion on Checkoff*, 22 LRRM 46–47 (1948).

As unionism spread from the private-sector NLRA context to the public sector over the ensuing decades, the concept of dues authorizations and annual windows generally followed. But, as it remains to the Supreme Court an open question whether the NLRA triggers state action, see *Janus*, 138 S. Ct. at 2479, n.24, there is nothing constitutional about this one-year tradition. Without a constitutional backstop, there is no guarantee that public-sector unions and their legislative allies will stop at a year. The spate of anti-*Janus* legislation indicates a willingness in some jurisdictions, including New Jersey, to make certain that as much money as possible flows to the unions despite an employee's desire to make it stop.

---

[5] Appellant's Brief at 36-40.

### D. Defendants Take Steps to Avoid Judicial Review

That desire to keep the money flowing as long as possible likely has animated some of the litigation choices in this case. It was not until JNESO recognized the threat posed by this case – it being well positioned to lead to a merits ruling on a constitutional right to resign and/or end financial support to public-sector unions and thereby overturn <u>N.J.S.A.</u> § 52:14-15.9e – that a check issued. In the meantime, JNESO has assiduously avoided discussing whether there is a non-*Janus* based right to resign or end financial support.[6] Despite this Court stating in *LaSpina v. SEIU Pa. State Council*, 985 F.3d 278, 288 (3d Cir. 2021), that the plaintiff there "presumptively became a 'nonmember' of the union when she mailed her resignation letter," *LaSpina* is not cited in JNESO's brief.[7] JNESO does at least make a merits argument – that *Janus* itself does not create a right to resign and that dues authorizations must be enforced.

The State Defendants meanwhile do not make any merits arguments at all.[8] Instead, they seek to prolong a suit wherein they have sought repeated stays by

---

[6] JNESO's brief before this Court only had 8,395 of the permissible 13,000 words.

[7] This obviously means that the discussion of *Campbell-Ewald*, 577 U.S. 153 (2016) and mootness in *LaSpina* was ignored as well.

[8] State Defendants too had more than enough space in their brief before this Court having used just 10,582 of the permissible 13,000 words.

seeking either what is almost certain to be a fruitless discovery request or (years after this litigation began) a certification to the New Jersey Supreme Court. The delay could affect the constitutional rights of the 315,000 public employees who would have their ability to leave a union and end financial support to it limited.

The Seventh Circuit in *Conrad v. Boiron, Inc.*, 869 F.3d 536 (7th Cir. 2017) recognized that sometimes a plaintiff wants to bring a case to decision to establish an "important principle." *Id.* at 542. Lutter wants to establish a precedent and to make it apparent that <u>N.J.S.A.</u> § 52:14-15.9e is unconstitutional. This is her "important principle" and why she has refused to cash the proffered check from JNESO.

JNESO and the State Defendants seem to hope that this Court will either: (1) rule in their favor on justiciability grounds; or (2) be reticent to address the merits in the first instance without additional briefing from them. Any delay that would ensue from getting the case into a position to address the merits would infringe on the Constitutional rights of public-sector employees, and harm them as they would continue to be forced to financially subsidize public-sector unions while they await a merits decision on the issue.

## II.   DEFENDANTS' DELAY TACTICS SHOULD BE REJECTED AND THE COURT SHOULD DECLARE THE WDEA UNCONSTITUTIONAL

### A. Even if the Court were to find *Fischer* is persuasive, the Dues Authorization in Lutter is factually and legally distinguishable

On the merits, JNESO contends: (1) *Janus* itself does not support a First Amendment right to resign or to discontinue financial support; and (2) dues-authorization-agreement forms, regardless of their terms (or lack thereof), prevent relief.

Albeit in an unpublished opinion, this Court has already accepted JNESO's argument that *Janus* itself does not create a right to "terminate [a] payment to [the public sector union] at any time." *Fischer v. Governor of New Jersey*, 842 Fed. Appx. 741, 751 (3d Cir. 2021). Citing *Cohen v. Cowles*, this Court indicated: "Changes in decisional law, even constitutional law, do not relieve parties from their pre-existing contractual obligations." *Fischer*, 842 Fed. Appx. At 751. On this point, Lutter stands by her discussion of *Janus* from her original brief to this Court articulating why *Janus* does support a First Amendment Right to resign or discontinue financial support.

However, even if the Court were to find *Fischer* persuasive, it is factually different from the situation presented here as the dues authorizations present in *Fischer* were very different from the one signed by Lutter.

JNESO contends that Lutter's signing of a bare-bones dues authorization

prevents a holding that she has a First Amendment right to resign or to seek to stop

financing the union and otherwise does not discuss the merits. Pointing to *Fischer*,

JNESO asserts that this Court and others "have uniformly upheld the validity of pre-

*Janus* dues deductions authorizations." JNESO Brief at 34.

The problem for JNESO is that it is not the mere existence of any dues

authorization *per se* that prevents relief. Rather, it is the effect of the terms of those

due authorizations. Here, the dues authorization was quite simple. It was titled

"Membership/Dues Deduction" and named the union, the employee, the employer,

and the amount of the dues (1.5% of gross pay). (J.A.0060). The only operative

portion of the document simply stated, "I authorize Payroll Deduction of dues as set

by the union when payroll deductions available." *Id*. The document did not contain

a limitation on when either membership to the union could be ended or when

financial support to the union could be ended. Thus, even if *Fischer* is controlling,

there is nothing in Lutter's dues authorization limiting when she can resign or

requiring her to continue financial support for a certain time period after her

resignation.

### B. Defendants Seek to Avoid an Adjudication on the Merits as They Recognize This Case Presents A Fact Pattern Which Supports A Finding that the WDEA is Unconstitutional

The State Defendants entirely ignore the merits in the hope of a remand for

discovery (after having sought and received numerous stays preventing factual

development in the District Court) or a certification to the New Jersey Supreme Court (an issue raised for the first time two years and eight months into the litigation). Further, it almost certain that no factual development is going to change the current parameters of the case.

Citing *Fischer*, the State Defendants imagine there might be a heretofore undiscovered document that would put this case on that same footing. Further, they point to the term "as set by the union" in the dues agreement that actually is in the record as support that there might be something dispositive to be discovered.

The State Defendants have requested various continuances and stays of this action. No doubt that some continuances are agreed as a matter of common courtesy between counsel and that COVID has made litigation more difficult for the parties, litigators, and the court system. Be that as it may, this matter was filed on June 6, 2019. On September 16, 2019, Defendants sought a stay pending trial-court resolution of *Fischer*, *Smith*,[9] and what would become *Thulen v. AFSCME New Jersey Council 63,* 844 Fed. Appx. 515 (3d Cir. 2021). D/E # 32.[10] On September 18, 2019, Plaintiff Appellant opposed that stay and was prescient in stating: "*Smith*

---

[9] *Smith v. New Jersey Education Association*, 425 F. Supp. 3d 366 (D.N.J. 2019) was a separate action at the District Court that was merged with *Fischer* at this Court.

[10] Here, JNESO claims that the undersigned litigated all three of these cases. Brief for Appellee JNESO at 5, n.1. That is incorrect. The undersigned litigated one of them – *Thulen*. JNESO is correct that the trial court was the same for all three.

and *Fischer* involve other types of claims that may or may not prevent a clear holding on § 52:14-19.e" and "Plaintiff Lutter has an individual claim in a separate case that may or may not be addressed by other cases filed in [the district court]." D/E # 37. On December 8, 2019, the case was stayed for 90 days. D/E # 41.

On December 20, 2019, after *Fischer* and *Smith* were decided by the District Court on grounds that made the instant action distinguishable, Lutter sought a lift of the stay. D/E # 47. On December 23, 2019, the State Defendants sought to continue the stay pending the District Court deciding *Thulen*. The stay was lifted on February 5, 2020. D/E # 49.

On April 2, 2020, after JNESO attempted to moot this matter via the check, it filed a motion in accordance with its actions. D/E # 56. On April 17, 2020, the District Court asked the parties to address mootness and whether the action should be stayed pending appeals of *Fischer*, *Smith*, and *Thulen*. D/E # 65. Lutter filed an opposition brief to JNESO's motion to dismiss (which also supported her cross-motion for declaratory judgment) on May 22, 2020. D/E # 68. On June 11, 2020, the State Defendants sought a case management conference to discuss filing dates in light of COVID and the appeals. D/E #72. That next day, Lutter filed a letter that stated in part: "Plaintiff objects to any further delay in adjudicating her claims, and therefore objects to Counsel's request to the extent a Case Management Conference would further delay a decision on the merits of her claims." D/E # 73. On August 3,

2020, the State Defendants filed a brief seeking a stay of this matter until the appeals in *Fischer*, *Smith*, and *Thulen* were decided. D/E # 84.

On November 30, 2020, the District Court dismissed a couple of claims, but refrained from ruling on others. D/E # 94. The court sought additional briefing on this Court's decision in *Hartnett v. Pennsylvania State Education Association*, 963 F.3d 301 (3d Cir. 2020) and again sought the parties' input on a stay. *Id.*

On January 22, 2021, the State Defendants again sought to have this matter stayed at the District Court pending decisions by this Court. D/E # 99. On February 8, 2021, Lutter again argued against a stay. D/E # 101. On June 1, 2021, the District Court dismissed the remainder of the action. D/E # 106.

Thus, the State Defendants now complain about the state of the record after having sought numerous stays in this matter over the course of a couple of years. As a matter of equity, such tactics should not be condoned. But, even if this Court were to consider this request, any discovery will almost certainly be a waste of time. JNESO would have control of any document between Lutter and it. JNESO's counsel has had the same access to this Court's *Fischer* decision that other parties did. If there were terms in some sort of agreement between JNESO and Lutter that in some way expressly either limited the timing of her resignation or her ability to

end financial support, it would have been disclosed by now.[11] Further, note that this Court has allowed some non-pleading documents to be presented in Fed. R. Civ. P. 12(b)(1) challenges. *Berardi v. Swanson Mem'l Lodge No. 48 of Fraternal Order of Police*, 920 F.2d 198, 200 (3d Cir. 1990). So, again, if JNESO had anything, it would be, and should be, in the record by now.

Finally, the term "as set by the union" in the dues agreement goes to the amount of dues not to whether there is a limitation on Lutter's ability to resign or end financial support to the union.

This Court should not countenance this delaying tactic, which is almost certainly a waste of time.

### C. Certification To the New Jersey Supreme Court is Not Appropriate

Regarding certification, on April 3, 2020, the State Defendants filed their answer, which included 21 affirmative defenses, and made no mention of certifying this matter to the New Jersey Supreme Court. D/E # 60. In their August 3, 2020, brief seeking dismissal, the State Defendants did not discuss certifying this matter to the New Jersey Supreme Court. D/E # 84.[12] In their January 21, 2021, letter brief,

---

[11] Further, note this discovery request was in the State Defendant's last dispositive motion at the trial court. Yet, JNESO, which would have control of any such aiding document, does not join in the discovery remand request here.

[12] This failure is all the more peculiar since State Defendants raised that matter with this Court in *Fischer* on July 8, 2020.

the State Defendants did not discuss certifying this matter to the New Jersey Supreme Court.

The question of whether to certify is discretionary. The delay in seeking that certification should certainly be a significant factor. But perhaps more importantly, the Attorney General and Governor's argument that N.J.S.A. § 52-14-15.9e is supposed to in any way benefit a public-sector employee seeking to leave a union or end financial support is difficult to accept given its express terms and the circumstances surrounding passage of that law discussed above. Regardless, this Court was presented with a similar request in *Fischer*, and saw no need to certify then and instead interpreted the statute on its own volition.

Thus, this second delaying tactic is also without merit.

### D. This Matter Is Justiciable, and Defendants' Attempts to avoid Judicial Review Should Not be Permitted

On mootness and standing, JNESO contends: (1) the unsolicited check moots any damages claim regardless of whether it was uncashed; and (2) having been given the check, there is no basis for Lutter to receive any prospective relief citing this Court's decision in *Hartnett*. The State Defendants mirror JNESO's justiciability arguments.[13] On the unsolicited-check question, the State Defendants more

---

[13] PERC Defendants/Appellants also make a perfunctory justiciability argument, all of which is subsumed and addressed more fully by JNESO and the Attorney General and Governor.

specifically contend *Campbell-Ewald* should only apply to class actions and that this Court's discussion of uncashed checks in *LaSpina* is flawed.[14]

Starting with mootness, both JNESO and the State Defendants point to a number of cases where unsolicited checks from public-sector-unions led to a mootness holding and imply the similar factual circumstances should control here.[15] But, there is no such thing as a union-specific mootness test. While Defendants can point to a number of cases in their favor, Lutter can too and did in her initial brief.

One case Lutter overlooked (as did JNESO and the State Defendants in their responses) was *Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81 (1st Cir. 2021). There, the First Circuit upheld a trial court's denial of class certification. Then, it turned to the unsolicited-check question and held that such a check did not moot a damage claim. *Id.* at 94-95. This case undercuts the State Defendants contention that *Campbell-Ewald* should only apply where there is a class action. Further, it undercuts State Defendants' major argument regarding why *LaSpina* was incorrectly decided. Finally, *LaSpina* was decided as an individual claimant and only then was any potential class-representative implications considered. *LaSpina*, 985 F.3d at 290.

---

[14] Again, in its brief, JNESO does not discuss or cite to *LaSpina*.

[15] Brief of Appellee JNESO, at 16-19, 23; Brief of State Appellees, at 25-26.

State Defendants' attempts to distinguish *LaSpina* fail, and this Court should formalize its thinking from *LaSpina* into a precedential holding that an unsolicited check does not moot a damage claim.

On standing, the various Defendants contend that since Lutter is out of the union, no future looking relief like an injunction is possible. If, in the course of awarding Lutter her damages, this Court were to declare that N.J.S.A. § 52:14-15.9e is unconstitutional in a published opinion, it would largely have the practical effect of rendering the statute unenforceable in the future thereby obviating the need for any injunctive relief to Lutter. An injunction against the State Defendants or PERC Defendants would be preferred, but it would be difficult on claim and issue preclusion grounds for governmental officials or a public-sector union to enforce N.J.S.A. § 52:14-15.9e if there were a published decision from this Court setting forth its unconstitutionality.

None of the justiciability doctrines justifies a dismissal of this action. Lutter should be allowed to seek to establish her "important principle" despite JNESO's check.

### E. The Eleventh Amendment Does Not Bar Plaintiff's Claims

Finally, the PERC Defendants contend they do not enforce N.J.S.A. § 52:14-15.9e and enjoy Eleventh Amendment immunity. The Supreme Court recently dealt with the issue of the proper state defendants in *Whole Woman's Health v. Jackson*,

595 U.S. ___, 142 S. Ct. 522 (2021). There, the Supreme Court reaffirmed that "in [*Ex parte Young*, 209 U.S. 123 (1908)] this Court recognized a narrow exception grounded in traditional equity practice—one that allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law." *Whole Woman's Health*, 142 S. Ct. at 532. Thus, the PERC Defendants were properly named as Defendants since PERC has jurisdiction over state and local employee matters with their labor unions. But, as with the State Defendants, an injunction may not be necessary if there is a published decision from this Court on the merits.

## **RELIEF REQUESTED**

For the reasons stated above and it her initial brief, Plaintiff requests that the judgment of the District Court be reversed, and this matter remanded to the District Court for any necessary further proceedings.

Respectfully Submitted,

By:    /s/ Matthew C. Moench

Patrick J. Wright, Esq.                     Matthew C. Moench, Esq.
Mackinac Center Legal Foundation            King Moench Hirniak & Collins, LLP
140 W. Main Street                          51 Gibraltar Drive, Suite 2F
Midland, MI 48642                           Morris Plains, New Jersey 07950
(989) 631-0900                              (973) 998-6860
wright@mackinac.org                         mcm@kmhmlawfirm.com

## <u>CERTIFICATE OF COMPLIANCE</u>

*Pursuant to Fed. R. App. P. 32(a)(7)(B), I certify the following:*

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5067 words and 441 lines of text.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Times New Roman font.

*Pursuant to Local Rule 31.1(c), I certify the following:*

1.     This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Windows Defender (Antimalware Client Version 4.18.2001.10) virus detection program has been run on the file containing the electronic version of this brief and no viruses have been detected.

KING, MOENCH, HIRNIAK & COLLINS, LLP


February 1, 2022              */s/ Matthew M. Moench*
                             Matthew M. Moench
                             *Attorneys for Appellant*
                             *Jody Lutter*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 1, 2022, I electronically filed the Reply Brief of Appellant, Jody Lutter with the Clerk of the Court by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that the service will be accomplished by the CM/ECF system with hardcopies when directed by the Court via United Parcel Service, Second Day Air.

KING, MOENCH, HIRNIAK & COLLINS, LLP

February 1, 2022          */s/ Matthew M. Moench*
                          Matthew M. Moench
                          *Attorneys for Appellant,*
                          *Jody Lutter*